**GLORIA FREDELLA, By her Next Best Friends, JEANNE TITCHENER, KENNETH HUBBARD, and DENIS HUBBARD, Petitioners**

v.

**THE HONORABLE ALEXANDER A. FARRELLY, Governor, GOVERNMENT OF THE U.S. VIRGIN ISLANDS, DR. WILBUR CALLENDAR, Medical Director, St. Thomas Community Hospital, and ST. THOMAS/ST. JOHN HOSPITAL FACILITIES BOARD OF TRUSTEES, Respondents**

Family No. FM15/1992

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

March 15, 1993

90

■■■■

■■■■

DAVID A. BORNN, ESQ. (BORNN, BORNN, HANDY & RASHID), St. Thomas, V.I., *for petitioners*

ANTONIO AROCHO-SOTO, ESQ. (Assistant Attorney General), St. Thomas, V.I., *for respondents*

FREDERICK G. WATTS, ESQ. (WATTS, STREIBICH & BENHAM) St. Thomas, V.I., *Guardian Ad Litem for Gloria Fredella*

SMOCK, *Judge*

## MEMORANDUM OPINION AND ORDER

The children of Gloria Fredella ("Ms. Fredella") requested that this court issue an order directing the respondents to disconnect the ventilator which was allowing Ms. Fredella to continue breathing.[1] Although the medical testimony in this matter pointed to the probability that, with continued aggressive or "active" maintenance, Ms. Fredella's heart would continue to beat and her lungs to function with the aid of a ventilator for an indefinite period of time, the court concluded on November 20, 1992 that Ms. Fredella was legally dead, and the ventilator could be disconnected.[2]

## FACTUAL BACKGROUND

On November 4, 1992, Ms. Fredella suffered a massive stroke as a result of a cerebral hemorrhage on the left side of her brain. It is likely that she was not discovered and medical assistance rendered for at least five to six hours following her stroke.[3] It thus appears that, since her lungs were not functioning for a good portion of that

---

[1] A ventilator is a medical device that assists or replaces natural mechanisms for breathing. The terms "ventilator" and "respirator" are often used interchangeably.

[2] Following a hearing on November 20, 1992, the court placed its findings of fact and conclusions of law on the record, and thereafter entered an order on that same date, allowing respondents to disconnect the ventilator. This Memorandum Opinion is intended to memorialize and expand upon this court's bench record.

[3] A CAT Scan performed on November 4, 1992 indicated a blood clot in the brain which had caused intracerebral hematoma (bleeding) which undoubtedly led to Ms. Fredella's stroke.

time, her brain was completely deprived of oxygen for several hours. Her heart, however, remained beating throughout the stroke and subsequent hospitalization.[4]

At the time of her discovery, Ms. Fredella was in a coma, a condition which remained unchanged. At the St. Thomas Hospital, she was taken to the Intensive Care Unit, and immediately placed on life support systems. She was then attended to by Dr. James D. Nelson and Dr. Leighmin James Lu, both Board Certified Neurologists, and Dr. Edward Saunders, an Internist.

Four Electroencephalograms ("EEGs") were ordered and administered on November 5, November 6, November 7 and November 17, 1992.[5] The first report filed by Dr. Nelson contained his findings of, ". . . severe generalized disturbance of cerebral activity. At least 50% of the recording is isoelectric." By isoelectric, Dr. Nelson meant a lack of electrical activity in the brain. Dr. Nelson's report on November 17, 1992 found that the ". . . recording continues to show evidence of a severe generalized disturbance of cerebral activity. It is about 70% isoelectric." Dr. Lu testified that Dr. Nelson's conclusions might be somewhat conservative and that it was more likely that the readings were at least 90% isolectric. Both doctors agreed, however, that the situation was rapidly deteriorating and that soon all EEG lines would be almost totally flat. More importantly, they both acknowledged that whatever electrical activity was still being recorded on the EEG involved virtually no detectable or quantifiable brain activity.

Since her hospitalization, Ms. Fredella had shown virtually no signs of any brain activity. Specifically, she remained motionless, with her eyes in a fixed and open position and her pupils dilated. As noted previously, she breathed only by means of a ventilator,[6] and was fed by a gasonastric tube and intravenous injections. She was virtually immune to all external stimuli, with two exceptions. First, Dr. Saunders testified that one of the nurses had noticed some slight movement in Ms. Fredella's hands. None of the three physi-

---

[4] The operation of the heart, according to the medical testimony, remains largely unaffected by brain activity or lack thereof.

[5] An electroencephalogram is a graphic record of the electrical activity of the brain.

[6] A modified apnea test, which determines if a patient is capable of breathing without the assistance of a ventilator, was administered to Ms. Fredella and its results revealed no ability on her part to breathe spontaneously.

cians had seen this, and they agreed that it was, at most, nothing more than a reflexive action without reference to brain activity.

Of more concern to the court was the fact of Ms. Fredella's reaction to painful stimuli on her toes. When such was applied, her feet would move in the direction of her head. Dr. Lu observed, however, that this reaction was becoming less intense over time. When this fact was brought to the court's attention at the hearing on November 18, 1992, none of the physicians could satisfy the court's inquiry as to whether or not this reflex was caused by some continuing brainstem activity or was simply a reflexive spinal cord reaction. With the concurrence of Dr. Lu, the court therefore ordered an Evoke Reflex Reaction EEG.

This procedure involves the taking of an EEG while painful stimuli are applied to certain exterior portions of the body, which in Ms. Fredella's case involved the toes. The court received the results of this EEG on November 20, 1992. While the application of stimuli did cause the feet to once again move toward the head, all recordings in the brainstem area remained isoelectric. This last EEG confirmed that movement and reflexes retained by Ms. Fredella were not directed by the brainstem. In conclusion, the physicians found no evidence of spontaneous brain function, even in the brainstem.

## DISCUSSION

One traditionally thinks of the existence of human life in terms of a beating heart and breathing lungs. Medical technology has now advanced to the stage where it is possible in many cases to maintain a patient's heart and lung functions for an indefinite period of time even in the absence of brain activity. Such medical advances have made it inevitable that debate over the establishment of criteria for establishing a legal determination of death should become complex and emotional.

According to 19 V.I.C. 869,

(a) A person shall be considered medically and legally dead if, in the opinion of a licensed physician based on ordinary standards of medical practice, there is an absence of spontaneous respiratory and cardiac function and, because of the disease or condition which caused, directly or indirectly, these functions to cease, or because of the passage of time since these functions ceased, attempts at resuscitation are considered hopeless; and in this event death will have occurred at the time these functions ceased; or

94

(b) a person shall be considered medically and legally dead if, in the opinion of a licensed physician, based on ordinary standards of medical practice and because of a known disease or condition, there is an absence of spontaneous brain function; and, if based on ordinary standards of medical practice, during reasonable attempts to either maintain or restore circulatory or respiratory function in the absence of spontaneous brain function, it appears that further attempts at resuscitation or supportive maintenance will not succeed; and in this event death will have occurred at the time when these conditions first coincide.

(c) Death is to be pronounced before artificial means of supporting respiratory and circulatory functions are terminated and before any vital organ is removed for the purpose of transplantation.

(d) These alternative definitions of death shall be utilized for all purposes in this territory, including the trials of civil and criminal cases, any laws to the contrary notwithstanding.

These provisions were based almost word for word on Kansas legislation, K.S.A. 1980 Supp. 77–202, which was enacted in 1970. Although Kansas has since substantially amended its statute, it was the first attempt at the time to codify a determination of death based upon brain death or, in the words of the statute, ". . . absence of spontaneous brain function. . ."

While Section 869 must be utilized as the current Virgin Islands standard for determining death, it is a woefully inadequate vehicle for such a task. Its defects have been ably set forth elsewhere:

The primary fault with this legislation is that it appears to be based on, or at least gives voice to, the misconception that there are two separate phenomena of death. This dichotomy is particularly unfortunate because it seems to have been inspired by a desire to establish a special definition for organ transplantation . . . Although there is nothing in the Act itself to indicate that physicians will be less concerned with safeguarding the health of potential organ donors, the purposes for which the Act was passed are not hard to decipher, and they do little to inspire the average patient with confidence that his welfare (including his not being prematurely declared dead) is

of as great concern to medicine and the State of Kansas as is the facilitation of organ transplantation.

Alexander M. Capron and Leon R. Kass, A Statutory Definition of the Standards for Determining Human Death: An Appraisal and a Proposal, 121 U.Pa.L.Rev. 87, 109–110 (1973). Section 869 provides only limited guidance concerning a definition of what constitutes legal death and when, if at all, life-sustaining treatment may be terminated. Ms. Fredella's case is one of a few that falls within the confines of Section 869(b). In order to make a determination of legal death under this section, the court first had to define the term, ". . . absence of spontaneous brain function . . ." For this task we first looked to the meaning given it by the Kansas courts, which have previously construed this legislation.[7]

Kansas case law teaches us that there are three criteria to be considered in determining whether a person has any spontaneous brain function. They are: (1) lack of reaction and responsiveness to externally applied and normally painful stimuli; (2) the absence of any spontaneous movements or breathing; and (3) the absence of reflexes.[8] All of these criteria must be confirmed by EEGs taken over a minimum of 24 hours. Kansas v. Shaffer, 624 P.2d 440 (Kan. 1981). Based on these criteria, Ms. Fredella clearly had no spontaneous brain function. There was no reaction or responsiveness to painful stimuli, no spontaneous movements (other than reflexive actions having no connection to brain activity), no spontaneous breathing and a complete absence of reflexes except, again, responses having no brain direction. All of these were confirmed by EEGs taken between November 5 and November 20, 1992.

Section 869(b) requires a further finding that, ". . . during reasonable attempts to either maintain or restore circulatory or respiratory function in the absence of spontaneous function, it appears that further attempts at resuscitation *or supportive*

---

[7] . . . [I]n considering Virgin Islands legislation taken from other jurisdictions, this Court must construe such legislation to mean what the Courts of the jurisdictions from which the legislation was borrowed have determined to be the true meaning of that legislation." Berkeley v. West Indies Enterprises, Inc., 9 V.I. 251, 253 (D.V.I. 1971).

[8] These criteria were formulated by the Harvard Ad Hoc Committee, and were published by the Journal of the American Medical Association in 1968.

*maintenance will not succeed* . . . (Emphasis supplied)." Succeed at what? Based on the medical testimony, Ms. Fredella's heart and lung functions could have been maintained for an indefinite period of time on supportive maintenance. The fact that medical technology may maintain heart and lung functions does not, however, preclude a legal determination of death. Courts which have considered this terminology have read into it the phrase ". . . in restoring such [brain] functions."[9] Commonwealth v. Golston, 366 N.E.2d 744, 748 (Mass. 1977).[10] All three doctors attending Ms. Fredella were adamant in their opinions that no amount of supportive or even "active" maintenance would succeed in restoring any of her brain functions. Accordingly, all requirements of section 869(b) have been satisfied.

■ In 1985 Judge David V. O'Brien set forth certain procedures to be followed in petitioning a court to terminate life support mechanisms pursuant to Section 869. Fleck v. Schneider, Misc. No. 1985/39 (D.V.I. 1985). The majority of those procedures are still valid, but they require some amendment due to a number of factors including, inter alia, the expansion of jurisdiction of this court and the reorganization of the Department of Health.

Accordingly, the following amended procedures shall now be followed by any party requesting termination of life support mechanisms:

1. A petition seeking termination of life support systems must be filed in the Territorial Court of the Virgin Islands.
2. The petition must be brought by a person of first priority as defined in 15 V.I.C. 236(a).
3. The petition must request appointment of a guardian ad litem to represent the interests of the patient. The guardian must be an attorney in good standing and attorney in good standing and licensed to practice law in the Virgin Islands. The choice of the guardian will be made by the Court.
4. The petition must provide for service on the Department of Justice of the Virgin Islands as the representative of the Government of the Virgin Islands, the Commissioner of Health,

---

[9] Indeed, as Ms. Fredela's guardian ad litem urges, any other reading would render Section 869(b) meaningless.

[10] In 1977 Massachusetts enacted legislation which was patterned on that of Kansas.

the Medical Director of the Hospital and the Hospital Facilities Board of Trustees (either the St. Thomas-St. John or St. Croix Board, as appropriate).

5. The petition will provide that at least three physicians, two of which must specialize in neurology, form an ad hoc committee to examine the patient. All three physicians must be certified to practice medicine in the Virgin Islands.

6. The petition must include statements under oath by all members of the ad hoc committee stating that the standard for death, as outlined in 19 V.I.C. 869, has been met.

7. The petition must state that the results of the ad hoc committee have been confirmed by at least two (2) electroencephalograms given at least twenty-four (24) hours apart.

8. The petition must specifically state what medical procedures are being used to sustain the patient and specifically state which of these procedures are to be terminated. The order which will issue from these judicial proceedings will specify what medical procedures are to be discontinued. Should the patient survive the termination of the medical procedures included in the petition and order, the Hospital and staff shall *not* have the authority to terminate any additional medical procedures. In order to terminate any additional medical procedures, the petitioner must submit a new petition and repeat the above-outlined procedures.

9. Upon completion of the petition, a hearing will be held before the court. The attendance of the guardian ad litem and at least one of the neurologists from the ad hoc committee will be required.

10. Upon the completion of the hearing, the court may enter a finding that acceptable medical procedures have been followed and that the standard of death, as outlined in 19 V.I.C. 869, has been met.

11. The Government of the Virgin Islands, the Commissioner of Health, Medical Director of the Hospital, Hospital Facilities Board of Trustees and medical personnel will not face civil liability or criminal penalty for termination of any medical procedures outlined in the petition and in the order of the court, if the procedures outlined are complied with in full.

As noted herein, the petitioners complied with all these procedures, and satisfied the court that the standard of death under 19 V.I.C. 869(b) was met. The court therefore directed that Ms. Fredella's ventilator be disconnected.

This court must emphasize again, however, that 19 V.I.C. 869 leaves untouched many difficult issues in the area of legal determination of death. In the controversial case of Cruzan v. Director, Missouri Department of Health, 110 S.Ct. 2841 (1990) (plurality opinion), the Supreme Court first addressed the issue now commonly referred to as "the right to die." As a result of serious injuries received during an automobile accident, Nancy Cruzan lapsed into a persistent vegetative state. She was not terminally ill, and it does not appear she would have satisfied the Shaffer criteria for lack of spontaneous brain function. The Supreme Court of Missouri denied her parents 'and co-guardians' request to terminate her life-support systems, finding no "clear and convincing" evidence that Nancy Cruzan, given her present physical condition, would have wished the systems disconnected. Id. at 2845.

The Supreme Court affirmed, noting that a state has the right to protect and preserve human life, and may thus place procedural safeguards on the decisions made by a surrogate for an incompetent person. Id. at 2852. This opinion has been subject to intense debate and criticism. See, for example, Susan R. Martyn and Henry J. Bourgiugonan, Coming to Terms With Death: The Cruzan Case, 42 Hastings L.J. 817 (1991).[11] Section 869 is silent on issues raised in Cruzan. This court does note, however, that even if Ms. Fredella's case had been subject to the strict Cruzan standard, it was fairly unique in that this court could have found that her wishes concerning life-support systems had been established by clear and convincing evidence. The record in this area is recited here strictly for purposes of illuminating how difficult, if not impossible, the standard of proof would be in its application.

Jeanne Titchener, Ms. Fredella's daughter, testified that her mother remarked on numerous occasions over a number of years of her desire not to be maintained on life support mechanisms. Ms. Fredella had no desire to be a financial burden to her children and,

---

[11] Henry Bourgiugonan is one of the sons of Ms. Fredella.

as she told her daughter in August 1992, she, ". . . wanted nothing keeping her alive unless she could do it on her own."[12]

Kenneth J. Hubbard, one of Ms. Fredella's sons, recalled an incident in Las Vegas, Nevada, approximately six to seven years ago. A friend of Ms. Fredella's had been in the hospital, and had several life support mechanisms attached to her. Ms. Fredella told her son that she had no desire to be kept alive by "artificial means" if her medical prognosis was not favorable. Another son of Ms. Fredella's, Denis Hubbard, also testified to conversations he had had with his mother concerning her aversion to life support systems. All of this testimony, together with that of Ms. Fredella's friend, Beatrice Robbins, established by clear and convincing evidence that Ms. Fredella had no desire to be maintained on life support mechanisms if there was no reasonable medical certainty that her condition would improve.

 It would be a rare case indeed that could present evidence of a person's intentions concerning life support systems so clearly and over such an extended period of time as that of Ms. Fredella. Much more common and difficult would be those situations in which a patient has never clearly articulated his or her wishes, either through a "living will"[13] or general conversation. One has only to review such emotionally and legally complex cases as In re Quinlan, 355 A.2d 647 (N.J. 1976), and In re Conroy, 486 A.2d 1209 (N.J. 1985), to arrive at the firm conclusion that the formulation of statutory guidelines is crucial for resolution of future cases.

The Legislature is the most appropriate forum for resolving issues relating to termination of life support systems for incompetent persons.[14] In the absence of legislation, the medical, moral, social,

---

[12] This testimony, as well as that of the brothers, Kenneth Hubbard and Denis Hubbard, was admitted pursuant to Rules 803(3) and 804(b)(5) of the Federal Rules of Evidence.

[13] A living will is an advance directive by a competent person which expresses a wish not to receive certain artificial means of support in the event that he or she is later unable to make such a wish known in the future due to medical incapacity. Such a procedure is recognized in the Virgin Islands by the enactment of the Uniform Durable Power of Attorney Act, 15 V.I.C. 1261 et seq.

[14] Without intending to either endorse or criticize any proposed statutory language, the court notes that the issue was once before the Nineteenth Legislature in the form of Bill No. 19-0196, which proposed a "Uniform Rights of the Terminally Ill Act and the Uniform Determination of Death Act." Neither was enacted in any form.

philosophical and legal questions raised in this area will have to be addressed on a case by case basis by individual judges.

Accordingly, it is

ORDERED that the respondents are hereby directed to disconnect and remove only the respirator apparatus connected to Gloria Fredella, at a time the respondents deem appropriate, and they shall not disconnect any other support mechanisms without further order of this court; and it is further

ORDERED that, should the respondents follow the procedure set forth herein, the respondents shall not incur civil liability or criminal penalty or liability for termination of any medical procedures permitted by this order; and it is further

ORDERED that copies of this Memorandum Opinion and Order shall be directed to David A. Bornn, Esq., Antonio Arocho-Soto, Esq., Assistant Attorney General, and Frederick G. Watts, Esq. (Watts, Streibich & Benham).